1

2

3

4

5

6

7

8

9
                    UNITED STATES DISTRICT COURT

10
                    EASTERN DISTRICT OF CALIFORNIA

11
                         ----oo0oo----

12
     J.L., a minor, by and through        CIV. NO. 2:14-01842 WBS EFB
13   his parent and guardian ad
     litem, Y.L. and Y.L.,                MEMORANDUM AND ORDER RE: CROSS-
14   individually,                        MOTIONS FOR SUMMARY JUDGMENT

15              Plaintiffs,

16        v.

17   MANTECA UNIFIED SCHOOL
     DISTRICT and SAN JOAQUIN
18   COUNTY OFFICE OF EDUCATION,

19              Defendants.

20   _____

21   AND RELATED COUNTERCLAIMS.

22

23                       ----oo0oo----

24        This suit was initiated by plaintiff J.L., a student

25   with an autism and speech language impairment, by and through his

26   mother and guardian ad litem, Y.L., against defendants Manteca

27   Unified School District and San Joaquin County Office of

28   Education ("SJCOE") under the Individuals with Disabilities

                                  1

1  Education Act (the "IDEA"), 20 U.S.C. §§ 1400 <u>et seq</u>.  Both

2  parties move for summary judgment pursuant to Federal Rule of

3  Civil Procedure 56.  (Docket Nos. 29, 30.)

4  I. <u>Procedural & Factual Background</u>

5          J.L. is a nine-year-old boy with autism who has been

6  eligible for an Individual Education Plan ("IEP") since 2009.

7  Pursuant to a settlement agreement, which was in effect until the

8  start of the 2012-2013 school year, J.L. attended the Kendall

9  School from April 11, 2011 through April 5, 2012, a center-based

10  one-to-one Applied Behavior Analysis ("ABA") program run by the

11  nonpublic agency Therapeutic Pathways.  (Admin. R. ("AR") at

12  2285.)  In May 2012, he transitioned to an autism-specific

13  severely handicapped special day class at Veritas Elementary

14  School within the Manteca Unified School District.  (<u>Id.</u>)  He has

15  a 1:1 aide with him at all times and the classroom employs ABA

16  methodologies throughout the day.  (<u>Id.</u> at 2564.)

17          On November 22, 2013, plaintiffs filed a request for a

18  due process hearing with the Office of Administrative Hearings

19  ("OAH") challenging various portions of J.L.'s IEP for the 2012-

20  2013 and 2013-2014 school years pursuant to 20 U.S.C. § 1415(f).

21  Administrative Law Judge ("ALJ") Peter Paul Castillo presided

22  over a nine-day hearing that involved approximately thirty

23  witnesses, over 2,000 pages of evidence, and generated over 2,000

24  pages of testimony transcripts.  (<u>Id.</u> at 2225.)  The ALJ found in

25  favor of plaintiffs on two issues and in favor of defendants on

26  all others.  Both parties have appealed the ALJ's decision

27  pursuant to 20 U.S.C. § 1415(i)(2).

28  II. <u>Applicable Law</u>

2

1    The IDEA, originally enacted in 1975 as the "Education

2 for All Handicapped Children Act," provides federal assistance to

3 state and local agencies for the education of children with

4 disabilities.  To qualify for assistance under the IDEA, a state

5 must provide a "free appropriate public education" ("FAPE") that

6 is tailored to the unique needs of the child with a disability

7 through the development of an "individualized educational

8 program."  20 U.S.C. § 1412(a)(1) & (4).

9    A "free appropriate public education" means "special

10 education and related services" that:

11

12 (A) have been provided at public expense, under public
   supervision and direction, and without charge;
   (B) meet the standards of the State educational agency;
13 (C) include an appropriate preschool, elementary, or
   secondary school education in the State involved; and
14 (D) are provided in conformity with the individualized
   education program required under [the Act].
15

16 Id. § 1401(9).  "Special education" is instruction specially

17 designed to meet the unique needs of a child with a disability.

18 Id. § 1401(29).  "Related services" are transportation and other

19 developmental, corrective, and supportive services, including

20 physical and occupational therapy, required to assist the child

21 in benefiting from special education.  Id. § 1401(26).  The IDEA

22 is satisfied if the state complies with the act's procedures and

23 "the individualized education program developed through the Act's

24 procedures [is] reasonably calculated to enable the child to

25 receive educational benefits."  Park, ex rel. Park v. Anaheim

26 Union High Sch. Dist., 464 F.3d 1025, 1031 (9th Cir. 2006).

27    An "individualized education program" or IEP is "a

28 written statement for each child with a disability that is

3

1    developed, reviewed, and revised in accordance with section

2    1414(d) of [the Act]."  Id. § 1401(14).  Section 1414(d) provides

3    that the IEP must contain a statement of the child's present

4    levels of academic achievement and functional performance and

5    measurable annual academic and functional goals.  Id.

6    § 1414(d)(1).  The IEP is developed and reviewed each year by a

7    team comprised of the child's parents, teachers, and other

8    specialists.  Id.

9  III. Discussion

10        The IDEA does not employ the usual deferential standard

11   of review for administrative decisions, but rather provides that

12   the court "(i) shall receive the records of the administrative

13   proceedings; (ii) shall hear additional evidence at the request

14   of a party; and (iii) basing its decision on the preponderance of

15   the evidence, shall grant such relief as the court determines is

16   appropriate."  20 U.S.C. § 1415(i)(2)(C).  The district court

17   should review for procedural compliance with the statute and for

18   whether the program is reasonably calculated to enable the child

19   to receive educational benefits.  Capistrano Unified Sch. Dist.

20   v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).

21        "The requirement that the district court receive the

22   hearing officer's record 'carries with it the implied requirement

23   that due weight shall be given to the [administrative]

24   proceedings.'"  Id. (quoting Board of Educ. v. Rowley, 458 U.S.

25   176, 206 (1982)).  The amount of deference given to the

26   administrative findings is within the court's discretion and

27   increases when the hearing officer's findings are "thorough and

28   careful."  Id.  The court gives the hearing officer's decision

4

1 "substantial weight" when it "'evinces his careful, impartial

2 consideration of all the evidence and demonstrates his

3 sensitivity to the complexity of the issues presented.'" County

4 of San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458,

5 1466 (9th Cir. 1996) (citation omitted).  Complete de novo review

6 is inappropriate because "Congress intended states to have the

7 primary responsibility of formulating each individual child's

8 education" and the court must defer to the "specialized knowledge

9 and experience" of the state's administrative bodies.  Amanda J.

10 ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877, 887-

11 88 (9th Cir. 2001).

12        The Ninth Circuit has recognized that the procedure

13 under the IDEA is "not a true summary judgment procedure," but is

14 "essentially . . . a bench trial based on a stipulated record."

15 Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472 (9th Cir.

16 1993).  "It is hard to see what else the district court could do

17 as a practical matter under the statute except read the

18 administrative record, consider the new evidence, and make an

19 independent judgment based on a preponderance of evidence and

20 giving due weight to the hearing officer's determinations."

21 Capistrano, 59 F.3d at 892.  "Even though [this method of review]

22 does not fit well into any pigeonhole of the Federal Rules of

23 Civil Procedure," it is appropriate because it "appears to be

24 what Congress intended under the Act."  Id.

25    A. Failure to Answer Defendants' Counterclaims

26        Defendants argue that because plaintiffs failed to file

27 an answer to defendants' counterclaims, plaintiffs judicially

28 admitted all of the matters alleged and the court can grant

1   defendants' motion for summary judgment on this ground alone.

2   (Defs.' Mot. for Summ. J. at 5-6 (Docket No. 29-1)); Fed. R. Civ.

3   P. 8(b)(6).  A party must serve an answer to a counterclaim or

4   crossclaim within twenty-one days of being served with the

5   pleading, id. R. 12(a)(1)(B), and an allegation "is admitted if a

6   responsible pleading is required and the allegation is not

7   denied," id. R. 8(b)(6).  See also Lockwood v. Wolf Corp., 629

8   F.2d 603, 611 (9th Cir. 1980) (finding the defendant's failure to

9   deny an allegation in its answer to the plaintiff's complaint

10  constituted an admission and, as a result, no evidence on this

11  element of the bankruptcy case was required); Keel v. Dovey, 459

12  F. Supp. 2d 946, 950 n.3 (C.D. Cal. 2006) (same).

13          The court, however, will not grant defendants' motion

14  for summary judgment on such a technicality.  Deciding the issues

15  based on this procedural error is inappropriate, especially in

16  light of the fact that both parties have already fully briefed

17  the issues and participated in a nine-day hearing in front of the

18  ALJ.  There is no question that defendants have been aware of

19  plaintiffs' claims and defenses from the beginning and were not

20  prejudiced by plaintiffs' failure to file an answer to its

21  counterclaims.  Accordingly, the court will deny defendants'

22  motion for summary judgment on this ground.

23    B. Assessments

24          A student must be assessed in all areas related to a

25  suspected disability.  20 U.S.C. § 1414(b)(3)(B); 34 C.F.R.

26  § 300.304(c)(4).  A procedural violation, such as a failure to

27  conduct appropriate assessments, results in a denial of a FAPE if

28  the violation (1) impeded the child's right to a FAPE, (2)

6

1   seriously infringed the parents' opportunity to participate in

2   the decision making process, or (3) caused a deprivation of

3   educational benefits.  See Park, 464 F.3d at 1031; Cal. Educ.

4   Code § 56505(f)(2).

5            1. Augmentative and Alternative Communication Assessment

6            Plaintiffs first argue that defendants denied J.L. a

7   FAPE by failing to assess him in the area of augmentative and

8   alternative communication ("AAC") in the 2012-2013 and 2013-2014

9   school years.  AAC includes all forms of communication, other

10  than oral speech, that are used to express thoughts, needs,

11  wants, and ideas.  (Pls.' Mot. for Summ. J. at 20 n.4.)  Special

12  AAC aids, such as picture and symbol communication boards and

13  electronic devices, can be used to help children express

14  themselves.  (Id.)

15           The ALJ correctly concluded that plaintiffs failed to

16  bring forth sufficient evidence that defendants were required to

17  conduct an AAC assessment to find communication tools that are

18  more effective for J.L.  Ginna Brents, the licensed speech and

19  language pathologist hired by plaintiffs, stated at the hearing

20  that an AAC assessment would benefit J.L. because "for a

21  communicative purpose, it's a good idea to see if [J.L.] would

22  benefit from an AAC device."  (Id. at 2387-88.)  Brents, however,

23  did not recommend an AAC assessment in either her 2010 or 2013

24  speech and language evaluations and also admitted at the hearing

25  that she never observed J.L. at school and therefore did not know

26  if his picture exchange book system was being implemented

27  consistently at school.  (Id. at 2389, 2409.)  Dr. Carina M.

28  Grandison, the developmental neuropsychologist hired by

1    plaintiffs, also failed to recommend such an assessment in her

2    developmental neuropsychology assessment report based on her

3    observations in May and September 2013.  (Id. at 1688-98.)

4    Similarly, SJCOE's speech and language pathologist, Isabel

5    Contreras, assessed J.L. in May-June 2012 and did not recommend

6    an AAC assessment.  (Id. at 837-47.)

7          There was also significant evidence presented that

8    defendants were already effectively using augmentative

9    communication with J.L. in the form of a picture exchange book

10   and that J.L.'s speech was emerging.  (See id. at 3568-69, long-

11   term substitute teacher Cindy Kelch; id. at 4371, SJCOE speech

12   and language pathologist Juana Mier-Anaya; id. at 2484, 2508-09

13   SJCOE behavior analyst Susan Scott; id. at 2509, 2603, 4089,

14   4097, SJCOE speech therapist Monica Filoso; id. at 2729, SJCOE

15   instructional assistant Wanda Luis; id. at 3734-35, senior

16   service coordinator at Valley Mountain Regional Center Elizabeth

17   Diaz.)  The school also attempted to teach J.L. how to

18   communicate with an iPad but J.L. did not show an interest in

19   this device.  (Id. at 2241.)

20         For all the above reasons, the court finds defendants

21   were not required to provide J.L. an AAC assessment.

22         2. Functional Behavior Assessment

23         Plaintiffs next argue J.L. was denied a FAPE under the

24   IDEA because defendants developed J.L.'s IEPs without a

25   functional behavior assessment.  In the "case of a child whose

26   behavior impedes the child's learning or that of others," the IEP

27   team must "consider the use of positive behavioral interventions

28   and supports, and other strategies, to address that behavior."

                                    8

1   20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); Cal.

2   Educ. Code § 56341.1(b)(1).  A functional behavior assessment is

3   one type of behavioral intervention or strategy that helps

4   identify causative factors and objectionable behaviors.  See

5   Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1026 (8th Cir.

6   2003).  A functional behavior assessment is not, however,

7   required.  See S.J. ex rel. S.H.J. v. Issaquah Sch. Dist. No.

8   411, Civ. No. C04-1926 RSL, 2007 WL 2703056, at *5 (W.D. Wash.

9   Sept. 12, 2007) (noting that a functional behavior assessment is

10  required only when a student has been removed from her current

11  placement).

12      In this case, the ALJ carefully weighed the evidence

13  and concluded that plaintiffs failed to establish that J.L. had

14  serious behavior problems at school that warranted a functional

15  behavior assessment.  The staff at Veritas were aware of J.L.'s

16  behavioral issues, such as scratching, pinching, lack of

17  attention, and running into others, but reported that they were

18  able to easily redirect J.L. from the maladaptive behaviors.

19  (See, e.g., AR at 4026, teacher Cindy Campero (testifying that

20  she could re-direct Ivan from staring at the ceiling in seconds);

21  id. at 3526, 3565, 3574 long-term substitute teacher Cindy Kelch

22  (testifying that J.L. was redirected from avoiding eye contact,

23  staring at the ceiling, or grabbing, pinching, and scratching in

24  seconds).)

25      The court agrees with the ALJ's finding that the report

26  produced by Dr. Carina M. Grandison, a developmental

27  neuropsychologist, was not as credible as the testimony of the

28  Veritas staff and overemphasized J.L.'s behavioral problems.  Dr.

1   Grandison was hired by plaintiffs and based her report on an
2   interview of Y.L., review of school records and a questionnaire
3   filled out by J.L.'s teacher, two observations and testing
4   sessions in the office, and two ninety-minute school observations
5   in April and September 2013.  (Id. at 1688-98, Dr. Grandison
6   Report of Developmental Neuropsychology Assessment.)  Dr.
7   Grandison observed J.L. staring at the ceiling and being
8   disconnected for much longer periods of time than reported by the
9   Veritas staff, particularly during her second school visit.  (Id.
10  at 1692-93.)  While J.L. was in her office, he was often crying,
11  refusing to work, lying on the floor, scratching, and kicking.
12  (Id. at 1693.)  Dr. Grandison noted that this behavior was
13  typical of what Y.L. reported seeing at home.  (Id.)  She
14  concluded that J.L.'s "behaviors outside of the school
15  environment are of great concern, maladaptive, and even posing
16  the risk of harming himself and others (such as scratching and
17  other acts of aggression)."  (Id. at 1697.)

18          The ALJ found that Dr. Grandison was not reliable
19  because she does not have experience in the behavior field, the
20  Veritas staff persuasively testified that Dr. Grandison's report
21  had several significant inaccuracies, the Veritas staff was more
22  convincing in their statements overall, and Dr. Grandison failed
23  to differentiate between J.L.'s behavior at home and at school.
24  (Id. at 2233-34.)  Given that the ALJ was able to listen to the
25  testimony of the witnesses and observe their demeanor first-hand,
26  he was better equipped to assess the credibility of the witnesses
27  than this court.  The court will therefore defer to his more
28  informed assessment of their credibility.

1          In addition, Susan Scott, a Board Certified Behavior
2    Analyst, did eventually conduct a functional behavior assessment
3    on behalf of defendants on April 30, 2013 in an effort to
4    cooperate with J.L.'s parents.  (Id. at 2448, 2599.)  The
5    assessment concluded that "[a]gression was observed at extremely
6    low levels in frequency, duration, and intensity" and "[b]ehavior
7    does not appear to be impeding [J.L.'s] learning."  (Id. at 388,
8    Functional Behavior Assessment.)  Scott recommended that J.L.'s
9    parents seek out behavior services at home because it was clear
10   from a comparison of Y.L.'s reports and classroom observation
11   that J.L. was "not displaying the same pattern of behavior at
12   school."  (Id. at 389.)  The assessment found that a positive
13   behavior support plan was not needed.  The assessment therefore
14   provides further evidence that additional functional behavior
15   assessments were not necessary in the 2013-2014 school year.

16         Accordingly, the court finds that the preponderance of
17   the evidence supports the ALJ's finding that defendants did not
18   deny J.L. a FAPE by failing to conduct additional functional
19   behavior assessments.

20    C. Parental Rights to Observe and Participate in Student's
21       Educational Decision Making Process

22         The parents of a child with a disability have a right
23   to be a member of the IEP team and to participate in meetings
24   respecting the identification, assessment, and education
25   placement of their child.  20 U.S.C. § 1414(d)(1)(B)(i); Cal.
26   Educ. Code §§ 56304, 56342.5.  "Among the most important
27   procedural safeguards are those that protect the parents' right
28   to be involved in the development of their child's educational

                              11

1  plan." Amanda J. ex. rel. Annette J., 267 F.3d at 882.  To

2  accomplish the IDEA's goal of providing all children with

3  disabilities a FAPE, it is critical that the parents, the

4  "individuals who have first-hand knowledge of the child's needs

5  and who are most concerned about the child," be involved in the

6  IEP creation process.  Id. at 891.

7       1. Quarterly Progress Reports on IEP Goals

8       The IEP must include a description of how the child's

9  progress toward meeting the annual goals will be measured and

10  when periodic reports on the child's progress will be provided,

11  such as through the use of quarterly or other period reports.  20

12  U.S.C. § 1414(d)(1)(A)(III).  Plaintiffs claim that they did not

13  receive quarterly progress reports and, as a result, Y.L. was

14  prevented from meaningfully participating in IEP meetings.  The

15  evidence demonstrates, however, that the ALJ was correct in

16  finding that defendants provided plaintiffs with quarterly

17  updates on J.L.'s progress in the form of handwritten updates on

18  the Kendall goals, (AR at 1596-1631, 2528-2530, 2577-83), goal

19  update forms, (id. at 1467-93, 2612), or bi-weekly narrative goal

20  updates, (id. at 1712-27, 1735-39, 3572, 4052-54, 4124-25).

21       2. Observation

22       Likewise, the evidence supports the ALJ's finding that

23  defendants did not deny Y.L. her parental right to participate in

24  the educational decision making process by requiring her to drop

25  off and pick up J.L. from the driveway, rather than directly from

26  the classroom, and limiting Y.L.'s observation of J.L.'s

27  classroom.  Plaintiffs first argue that Y.L. was treated

28  unequally because other parents were allowed to drop off and pick

1   up from the classroom on a daily basis and she was not.   (Id. at

2   2543.)   Defendants made clear, however, that while they

3   previously allowed classroom drop off/pick up, the security

4   policy changed and parents are all now required to drop off and

5   pick up students in the driveway.   (Id. at 498, Veritas Handbook,

6   2768.)   Further, it is difficult to conceive how the drop off and

7   pick up location relates to Y.L.'s rights to observe her child's

8   classroom.

9          Plaintiffs also argue Y.L. was prevented from observing

10  J.L.'s classroom even when she made requests to observe ahead of

11  time.   The Veritas handbook provides that parents may only visit

12  a child's classroom if it is "arranged in advance with the

13  teacher."   (Id. at 498.)   It further states that there "are times

14  when testing is taking place or other activities that may make

15  visiting an inappropriate distraction or that would disrupt

16  instruction."   (Id.)   Y.L. argues that defendants retaliated

17  against her advocacy work on behalf of J.L. by applying a more

18  strict observation policy to her than other parents.   (Pls.' Mot.

19  for Summ. J. at 39.)   Veritas staff's persuasively testified,

20  however, that they attempted to comply with Y.L.'s observation

21  requests but had to limit visitation periods to an hour to avoid

22  disrupting the classroom and that they sometimes could not

23  accommodate Y.L.'s requests because she did not provide them with

24  enough advanced notice.   (AR at 3176, 3239-42.)

25         Accordingly, the court must find that defendants did

26  not interfere with Y.L.'s parental rights by requiring her to

27  comply with its drop off/pick up and observation policies.

28         3. Parental Participation in IEP Meetings

13

1          "Parental participation in the IEP and educational

2     placement process is central to the IDEA's goal of protecting

3     disabled students' rights and providing each disabled student

4     with a FAPE."  Doug C. v. Haw. Dep't of Educ., 720 F.3d 1038,

5     1040-41 (9th Cir. 2013) (finding the student was denied a FAPE

6     because the parent was denied the opportunity to participate in

7     the IEP meeting).  An IEP meeting may be conducted without the

8     parents only if the parents "affirmatively refuse to attend."

9     Id. at 1041 (citation omitted).  Id.  Accordingly, the ALJ was

10    correct in finding that defendants committed a procedural

11    violation by holding the August 6, 2013 IEP team meeting in

12    Y.L.'s absence.  Defendants do not dispute that Y.L. requested to

13    reschedule the meeting and at no time refused to attend.  It is

14    no excuse that defendants sought to hold the IEP meeting before

15    the start of the upcoming 2013-2014 school year.[1]

16         Plaintiffs also contend that even when they were

17    included in IEP meetings, defendants ignored the parents' input

18    and thereby denied them their right to participate in the

19    decision making process.  While parents must be given an

20    opportunity to meaningfully participate, the education agencies

21    are not required to agree with the parents or to execute their

22    suggestions.  See, e.g., J.R. ex rel. W.R. v. Sylvan Union Sch.

23    Dist., Civ. No. S-06-2136 LKK GGH, 2008 WL 682595, at *10 (E.D.

24    Cal. March 10, 2008).  Plaintiffs identify examples of how

25    _____

26         [1]   The court need not address defendants' argument
      regarding whether in light of this finding plaintiffs were the
27    prevailing party for the purposes of attorney's fees as the
      attorney's fees are the subject of a separate action, Civ. No.
28    2:14-01364 WBS AC.

                                   14

1   defendants failed to adopt the changes the parents suggested but

2   fail to provide sufficient evidence that defendants refused to

3   consider the parents' input or denied them meaningful

4   participation.  In fact, contrary to plaintiffs' position, there

5   is evidence of several instances in which defendants changed

6   their course of action in response to the parents' requests and

7   concerns.  For example, defendants agreed to conduct an AAC

8   assessment and a functional behavior assessment at the parents'

9   request.  (AR at 193-96, 2448, 2599.)  Further, defendants

10  adopted the specific changes requested by J.L.'s parents to

11  J.L.'s first, second, sixth, and thirteenth annual goals and

12  objectives in his October 2, 2013 IEP.  (Compare id. at 362-64,

13  Plaintiffs' Letter with Input to Drafted Goals, with id. at 1509-

14  26, Oct. 2, 2013 IEP Annual Goals and Objectives.)  Plaintiffs

15  therefore did not establish that defendants failed to consider

16  their input.

17      D. Adequate Goals

18          The IEP must include "a statement of measurable annual

19  goals, including academic and functional goals, designed to" both

20  "meet the child's needs that result from the child's disability

21  to enable the child to be involved in and make progress in the

22  general education curriculum" and also to "meet each of the

23  child's other educational needs that result from the child's

24  disability."  20 U.S.C. § 1414(1)(A)(i)(II).  "The IEP shall show

25  a direct relationship between the present levels of performance,

26  the goals and objectives, and the specific educational services

27  to be provided."  Cal. Code. Regs., tit. 5, § 3040(b).

28          Plaintiffs contend that defendants failed to offer J.L.

15

1  adequate goals when he transferred from the Kandall School to

2  Veritas.  (Pls.' Mot. for Summ. J. at 46-48.)  J.L. had forty

3  operative goals at the Kendall School whereas he had only

4  eighteen offered at Veritas in the October 2, 2013 IEP.  (See AR

5  at 1509-26, IEP Annual Goals and Objectives.)  Plaintiffs

6  requested that defendants add fourteen additional goals but

7  defendants did not comply.  (Id. at 362-64.)  Plaintiffs contend

8  this is evidence that defendants failed to set goals sufficient

9  to meet J.L.'s needs.

10         The evidence, however, supports the ALJ's finding that

11  the goals were adequate.  For example, Marie Polk, a board

12  certified behavior analyst who was J.L.'s clinical supervisor at

13  the Kendall School and supervised the Kendall School aides who

14  helped transition J.L. to Veritas, testified that the forty goals

15  implemented at the Kendall School were not all targeted every

16  day.  (Id. at 3318-19.)  Instead, the Kendall School staff would

17  select priority areas for him and work on the goals in that

18  order.  (Id. at 3327.)  Further, she explained that the Kendall

19  School goals were distilled into a smaller number of goals when

20  J.L. transitioned to Veritas and that she supported the goals

21  that were ultimately agreed upon by the IEP team at Veritas.

22  (Id. at 3357.)  Moreover, aside from J.L.'s parents, none of the

23  witnesses suggested that J.L.'s goals were insufficient.

24         The record also supports the ALJ's finding that J.L.

25  continued to make progress on his goals after transferring from

26  the Kendall School to Veritas.  Dr. Grandison, whom the ALJ found

27  to be not credible as discussed above, and Y.L. were the only

28  witnesses who testified that J.L. regressed while at Veritas.  In

1   contrast, Polk testified that J.L. continued to make "slow

2   progress" and to "gain some skills" during the transition months

3   from Kendall School to Veritas that she oversaw.  (Id. at 3368.)

4   She represented that J.L. had a similarly slow rate of

5   acquisition while at the Kendall School.  (Id. at 3369-70.)

6   Further, the IEP team at Veritas, (id. at 1530), J.L.'s long-term

7   substitute teacher Cynthia Kelch, (id. at 3524, 3571), teacher

8   Cindy Campero, (id. at 3969, 4036-37, 4041-42, 4056, 4060-61),

9   SJCOE instructional assistant Wanda Luis, (id. at 2733), and

10  occupational therapist Kelly Inderbitzen, (id. at 4311-12, 4320-

11  24, 4328), all testified that J.L. was making progress towards

12  his goals.

13          Accordingly, the court finds that plaintiffs failed to

14  establish that J.L.'s IEP goals were inadequate or that he did

15  not make sufficient progress towards his goals.

16      E. Adequate Services

17          1. Fine Motor and Sensory Needs

18          Occupational therapy is a type of "related service"

19  that can be required in order for a student "to take advantage of

20  the education opportunities" and receive a FAPE.  Park, 464 F.3d

21  at 1033; see also 20 U.S.C. § 1401(26)(A).

22          Plaintiffs argue that the ALJ erred in finding that the

23  Occupational Therapy ("OT") consultations defendants provided in

24  the special day class at Veritas were sufficient and contend that

25  defendants should have provided direct pull-out OT services to

26  address J.L.'s sensory processing, core strength and security,

27  fine motor skills, gravitation insecurity and visual perception

28  issues.  (Pls.' Mot. for Summ. J. at 57.)  J.L.'s 2012 IEP

                                   17

1   offered sixty minutes per month of OT consultation and his 2013

2   IEP offered ninety minutes per month.  (AR at 4323-24.)

3        In finding in favor of defendants, the ALJ carefully

4   explained why he relied more on the report and testimony of

5   defendants' occupational therapist, Kelly Inderbitzin, who

6   recommended OT consultation, than the report and testimony of

7   plaintiffs' occupational therapist, Karen Chaddock, who

8   recommended direct OT.  The ALJ found that Chaddock "failed to

9   consider in her analysis that the Veritas special day class

10  integrates OT into its program, and that Veritas staff could

11  implement the recommendations she made in her report without

12  individual OT service."  (Id. at 2259.)  After reviewing

13  Chaddock's report, the court agrees that Chaddock recommended

14  J.L. "begin an OT clinic experience" and suggested that "[c]linic

15  based OT weekly can enhance his learning experience at school and

16  help prepare him to engage in pre-academics."  (Id. at 1372.)

17  Chaddock did not consider the OT programming already in place at

18  Veritas or what sort of OT would be appropriate in the context of

19  J.L.'s school, rather than a clinic.

20       The ALJ noted that Inderbitzin did not dispute J.L.'s

21  fine and gross motor and sensory processing deficits but rather

22  concluded that he would "benefit from Occupational Therapy

23  consultation and collaboration with the IEP team to help support,

24  modify, or adapt his education programming to optimize successful

25  occupational performance."  (Id. at 608.)  Inderbitzin testified

26  that the consultative model was sufficient because J.L.'s fine

27  motor and sensory goals could "be worked on in the classroom

28  every day" because the staff "have the knowledge to support the

18

1  goals." (Id. at 4324.)  Based on her knowledge of the Veritas

2  class and staff, she believed J.L. would benefit from working on

3  his goals throughout the day in different contexts, rather than

4  in only the discrete trial context.  (Id. at 4317.)

5       It is clear that the ALJ thoroughly and carefully

6  considered this question and that the preponderance of the

7  evidence supports his finding that direct OT services were not

8  required.

9       2. Speech and Language Services

10       The court agrees with the ALJ's reliance on the

11  professional opinions of Brents and the ALJ's finding that J.L.

12  required direct speech and language services, rather than just

13  consultation.  (See id. at 2259.)  After reviewing J.L.'s IEP

14  documents and conducting three to four hours of testing, Brents,

15  a licensed speech and language pathologist, concluded that J.L.

16  required five, twenty-minute sessions of direct speech and

17  language therapy per week with an additional hour of consultation

18  per month.  (Id. at 2375.)  She testified that this

19  recommendation was for direct speech services in the school

20  setting, not a clinical setting.  (Id. at 2374-75.)

21       Defendants argue that Brents relied on an improper

22  standard because she suggested that direct speech and language

23  therapy would "help [J.L.] make the greatest gains and most

24  rapidly acquire appropriate speech language and learnings skills"

25  and best meet his needs.  (Id. at 491 (emphasis added).)  The

26  IDEA does not require schools to provide children with

27  disabilities "the absolutely best or 'potential-maximizing'

28  education" but rather "to provide 'a basic floor of opportunity'

1  through a program 'individually designed to provide educational

2  benefit to the handicapped child.'"  Union Sch. Dist. v. Smith,

3  15 F.3d 1519, 1524 (9th Cir. 1994) (citation omitted); see also

4  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458

5  U.S. 178, 200-01 (1982).

6          Congress, however, "did not intend that a school system

7  could discharge its duty under the [IDEA] by providing a program

8  that produces some minimal academic advancement, no matter how

9  trivial."  Amanda J. ex rel. Annette J., 267 F.3d at 890

10  (citation and internal quotation marks omitted).  While Brents

11  recommended what she thought would be best for J.L., she also

12  found in both her 2010 and 2013 evaluations that J.L. was

13  "severely delayed in all aspects of communication and requires

14  intervention for speech and language remediation with a qualified

15  speech and language pathologist."  (AR at 490, 422.)  She

16  expressed "great concern" that he "does not currently have a

17  consistent communication system in the home and school

18  environments."  (Id. at 490.)  Direct services are, in her

19  opinion, necessary for J.L. to acquire the skills he needs to

20  communicate and to communicate consistently across different

21  environments.  (Id. at 491.)  Furthermore, while she did not

22  recommend direct services, SJCOE's speech and language therapist,

23  Isabelle Contreras, also recognized J.L.'s severe language

24  deficits and slow progress.  (Id. at 846-47, 2977.)

25          Accordingly, the court finds that the ALJ's order that

26  defendants provide 30 minutes a week of direct language and

27  speech services for the 2014 extended school year and the 2014-

28  2015 school year is supported by the record.

1    IT IS THEREFORE ORDERED that plaintiffs' motion for

2 summary judgment (Docket No. 30) be, and the same hereby is,

3 DENIED.

4    IT IS FURTHER ORDERED that defendants' motion for

5 summary judgment (Docket No. 29) be, and the same hereby is,

6 DENIED.  The ALJ was correct in finding that defendants committed

7 a procedural violation by holding the August 6, 2013 IEP meeting

8 without J.L.'s parents and a substantive violation by failing to

9 provide direct individual speech and language services.

10 Defendants are therefore ordered to provide the remedies

11 previously ordered by the ALJ.

12 Dated:   June 14, 2016

13

WILLIAM B. SHUBB
14 UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21